**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| MISTI MCBRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-CV-41-SNLJ |
| | ) | |
| AGXPLORE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

Plaintiff is suing AgXplore, her former employer, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and defamation under Missouri common law.  She is also suing defendants Tim Gutwein and Gunter Kreps, managers at AgXplore, for defamation.   Plaintiff voluntarily dismissed defendant Jon Hagler from her lawsuit.  [Doc. 39.]  The remaining defendants move for summary judgment on all plaintiff's claims.


I.      **Factual Background**

Plaintiff's complaint includes three counts: one count for hostile work environment under Title VII, one count for retaliation under Title VII, and one count for defamation against all defendants.   In reviewing a motion for summary judgment, the facts are construed in the light most favorable to the nonmovant.  *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005)

1

Plaintiff started at AgXplore as the Director of Marketing.  [Doc. 49 at ¶1.]  In September 2018, Barry Aycock, the previous owner of AgXplore, told plaintiff that she was to transition out of her role in marketing into the role of salesperson and that she would take over AgXplore's "house accounts."  *Id.* at ¶¶ 2–3.  The house accounts were longstanding client accounts that Aycock had established during his time at AgXplore.  *Id.* at ¶ 6.  These accounts generated millions of dollars of revenue for the company, and other salespersons envied plaintiff because they wanted a share of the accounts.  *Id.* at ¶¶ 7, 9. Plaintiff's prior marketing duties were transferred to three other female employees.  *Id.* at ¶ 4.  All salespersons worked remotely, away from the AgXplore office.  *Id.* at ¶ 5.  In October 2018, Gunther Kreps began working at AgXplore as the National Sales Director and acted as plaintiff's supervisor.  *Id.* at ¶ 10.

On November 7, 2018, plaintiff travelled to Savannah, Georgia with three male colleagues, including defendant Kreps, to visit clients.  *Id.* at ¶ 12.  After the client meeting, the group went out for dinner and had an eventful evening, filled with drinks and dancing with one another.  *Id.* at ¶¶ 13–15.  Upon returning to the hotel, plaintiff and defendant Kreps helped an intoxicated coworker to his hotel room.  The parties dispute what happened after that.  Plaintiff alleges that defendant Kreps told plaintiff that he urgently needed to speak with her privately in his hotel room about her "future role with the company."  [Doc. 53 at ¶ 6.]  Plaintiff wanted to discuss this in the hotel lobby, but she reluctantly followed defendant Kreps to his room at his insistence.  *Id.*  When in the room, defendant was on his bed while plaintiff stood ten to twenty feet away from him.  [Doc. 49 at ¶ 17; Doc. 49-1 at 166.]  Eventually, defendant asked plaintiff what kind of panties she

was wearing and if he could touch her. [Doc. 53 at ¶ 6.]  Without saying a word, plaintiff immediately left defendant's hotel room.  *Id.* at ¶ 6.  She alleges that, on her way out the door, defendant Kreps told her "do not say anything, do not tell anybody, because of his physical ailments, that he couldn't handle it." [Doc. 53-6 at 167–68.]  In any event, plaintiff was distressed by the whole incident, [Doc. 55 at ¶ 7], but she acknowledges that this incident was the first, and only, instance of sexual harassment she endured.  *Id.* at ¶ 18.

Defendant Kreps admits that plaintiff was in his hotel room after they dropped off the intoxicated coworker, but he denies plaintiff's account of the events.  He states that plaintiff invited herself into his room to use his bathroom.  She inquired about his health because he was lying on the bed due to pain from bilateral occipital neuralgia.  He says that plaintiff sat next to him on the bed and then lay down next to him.  Eventually, the two fell asleep there.  Sometime later, defendant Kreps woke up and he asked plaintiff to leave the room.  On her way out the door, he asked plaintiff for a goodnight hug, and plaintiff consented to giving him one.  [Doc. 53-6 at 67–68.]

Plaintiff did not immediately notify any other supervisor at AgXplore of the Savannah incident.  But weeks later, toward the end of November 2018, she told Aycock that Kreps made an "inappropriate comment" to her and that, in her opinion, Kreps should not travel with women on other business trips.  [Doc. 49 at ¶ 19.]  She did not elaborate on what this "inappropriate comment" was or otherwise explain the basis for her concern.  She did not refer to Kreps's actions as sexual harassment, and she refused to provide more information to Aycock even though he asked her to do so.  *Id.* at ¶¶ 20–22.

Plaintiff maintained that she did not want an investigation to be made, and AgXplore did not act on her allegations until she brought up the Savannah incident a second time on December 6, 2018. [Doc. 53-2 at 23–24.] At this point, AgXplore began an investigation conducted by Jon Hagler, its Chief Operating Officer. [Doc. 53 at ¶ 12.] Hagler sent plaintiff an email on December 21, 2018, asking her to disclose all details of her complaint by December 27, 2018 because, up to that point, she had not shared what transpired in the hotel room. [Doc. 53-6 at 74.] Once plaintiff finally provided full details, AgXplore assigned her to report to Hagler as her new supervisor, [Doc. 49 at ¶ 25], and Hagler told defendant Kreps not to have any contact with her. *Id.* at ¶ 26. In conducting the investigation, Hagler spoke with each of the employees who attended the Savannah trip, collected written statements, and made written findings. After concluding his investigation, he issued verbal warnings to all of the employees who attended the Savannah trip for their unprofessional behavior, especially that they drank too much alcohol. *Id.* at ¶¶ 34–35.

Meanwhile, defendant Gutwein, AgXplore's Executive Vice President at the time, did not believe plaintiff's account of events and appeared to side with defendant Kreps's version, that the sexual proposition never happened. [Doc. 53 at ¶¶ 18, 22.] Also, during this period, plaintiff alleges that defendant Kreps told several people that plaintiff was having extramarital affairs, and Kreps admits that he may have called her a "whore" or something to that effect. *Id.* at ¶ 24.

In any event, the parties agree that multiple employees gossiped about plaintiff's sex life after the Savannah incident. *See* [Doc. 53-3 at 29–32.] Defendants Gutwein and

Kreps also told Aycock that plaintiff had lied about the whole incident of sexual harassment because she was mad that she was not hired for the National Sales Manager role, even though she never applied for nor expressed interest in that position.  [Doc. 53 at ¶ 25.] Coworker Shane Van Fleet stated that defendant Gutwein told him, and other employees, not to talk to plaintiff, *id.* at ¶ 28, and she was, as a result, effectively shunned by her peers. [Doc. 53-11.]  Defendant Gutwein denies that he ever told any employee not to talk to her. [Doc. 53-2 at 55–56.]

On December 14, 2018—after the Savannah incident but before plaintiff had shared the full story—defendant Gutwein sent an email to Hagler suggesting that someone other than plaintiff should take over the house accounts and that "she is generally uncooperative."  [Doc. 53-14.]  But by January 1, 2019, plaintiff was working full-time as a salesperson with the house accounts and reported directly to Hagler.  Before fully transitioning into her new role, plaintiff alleges that she had difficulty finalizing her initial compensation agreement with Hagler and defendant Gutwein.  [Doc. 53 at ¶ 29.]

One point of contention was whether plaintiff should earn "double commission" on sales from new clients, like other salespersons did, as opposed to the regular commission rate for sales from existing accounts.  [Doc. 53-6 at 210, 315–16]; [Doc. 53-2 at 59–63.] Ultimately, her compensation agreement did not allow for double commission on new accounts. [Doc. 53 at ¶ 30].  Plaintiff claims that this was retaliation for her complaining about defendant Kreps.  [Doc. 53-6 at 288.]  Defendants counter that the disagreement was due to the internal debate about the fairness of plaintiff's commission schedule, settling on

no double commission because they wanted plaintiff to focus on growing business with existing customers, and not on bringing in new customers.  [Doc. 59 at ¶ 30].

The timing on the finalization of plaintiff's employment agreement is another point of contention.  Plaintiff complains that it took three months to finalize, which she thought to be an excessive amount of time.  [Doc. 53-6 at 288.]  It appears that the negotiation over plaintiff's employment agreement—including compensation and whether she should have the house accounts—started around the same time she began her transition from marketing to sales in September 2018, well before the Savannah incident.  The negotiation period ended sometime in December when Hagler gave her a written employment agreement, which was near the time Hagler first began its investigation into her complaints.  [Doc. 53-2 at 59].

After fully transitioning in January 2019, plaintiff worked diligently and effectively in her new role.  During this time, she did not receive any negative performance reviews. [Doc. 49 at ¶¶ 36–38.]  Then, in November 2019—a full year after the Savannah incident— AgXplore introduced a company-wide handbook that included a new anti-sexual harassment policy.  Human Resources Representative Sherry Bingman directed employees to review the Handbook and sign the acknowledgment form.  *Id.* at ¶¶ 41–43.  Plaintiff told Bingman that she would not sign the Handbook due to its cell phone, vehicle inspection, and social media policies, and that she wanted to have an attorney review it first before signing.  *Id.* at ¶ 44.  However, plaintiff never had an attorney review the Handbook.

By December 19, 2019, plaintiff was the only employee in the company not to have signed the acknowledgement form.  *Id.* at ¶ 47.  On that same day, plaintiff told Bingman

that she had not signed the acknowledgment because she was not comfortable with how her earlier complaint against Kreps had been resolved, and she was not confident that AgXplore would follow the sexual harassment policy in the future. *Id.* at ¶ 48–49. At this point, plaintiff knew that if she did not sign the Handbook, AgXplore would terminate her, as it required all employees to sign the acknowledgment. *Id.* at 43, 50. On hearing about plaintiff's hesitation and complaints, defendant Gutwein told Bingman that plaintiff has "a problem with the truth" and that he was okay with "eliminating her position." [Doc. 53 at ¶ 35.]

In response to Bingman's conversation with plaintiff, Bingman re-reviewed Hagler's investigation into the Kreps incident. *Id.* at ¶ 51. Bingman memorialized the oral reprimand that Hagler gave to Kreps by putting the reprimand in writing and having Kreps sign it. *Id.* at ¶ 52–53. Part of this reprimand was the warning that AgXplore does not tolerate sexually suggestive behavior or comments or employees being too intoxicated. *Id.* at ¶ 53.

Ultimately, plaintiff never signed the Handbook acknowledgements, and AgXplore interpreted plaintiff's refusal as a willful resignation. *Id.* at ¶¶ 50, 55. By refusing to sign the Handbook, plaintiff claims that she was treated differently than a group of similarly situated employees who refused to sign a different policy. In that regard, AgXplore had sometime earlier updated its conflict-of-interest policy, but some employees—including plaintiff—refused to sign an acknowledgment form. [Doc. 59 at ¶ 38]. Their refusal notwithstanding, those employees were not fired. Plaintiff received the same treatment in that instance as the other employees in that group, but this time, she was fired for not

signing the Handbook.   After her termination, her accounts were reassigned to other salespersons and her position was eliminated completely.  [Doc. 53-2 at 79–80.]

Plaintiff claims that defendants made several defamatory statements about her after she was fired and filed her lawsuit. As to defendant Gutwein, she claims that he defamed her in a company-wide memorandum sent on April 6, 2021.  In that memo,  defendant Gutwein said that AgXplore would dispute false allegations in court, though the memo never specifically referenced any of plaintiff's claims.  [Doc. 59 at ¶ 39.]

Plaintiff attributes more defamatory statements to defendant Kreps.  She claims that five different people told her that defendant Kreps told them that she was lying about her claims.  [Doc. 54 at 15.]  Plaintiff also claims that Brian Ciganiero, an AgXplore manager, told her that defendant Kreps told him at a lunch meeting that her claims were false.  [Doc. 53 at ¶ 40.]  Another AgXplore employee, Brandon McMillian, stated that after plaintiff's resignation (or termination), defendant Kreps told him and "others" that defendant Kreps did nothing wrong, that "Misti was just angry she did not get his position," that "her claim was a 'money grab'" and that she was "just angry she did not get his position."  [Doc. 53-18 at ¶ 8.]  Defendant Kreps also said that plaintiff had "nothing on him" and that she was "resorting to this to get revenge."  *Id.*  Finally, plaintiff argues that an AgXplore employee, Jennifer Posey-Williams, sent a text message to plaintiff attributing more defamatory statements to defendant Kreps. In that message, Posey-Williams said that defendant Kreps said that plaintiff was "lying about this whole allegation and [was] just simply jealous of his knowledge and experience in the ag industry."  [Doc. 53-19.]

## II.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).  After the moving party discharges this burden, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Can. Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248).

A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy.  *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004).   Self-serving, conclusory statements without support are not sufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993).  The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (internal citation omitted)

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts.  *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).  The court is required to resolve all conflicts of evidence in favor of the nonmoving party.  *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).


## III.    Discussion

Defendants move for summary judgment on each of plaintiff's claims for hostile work environment, retaliation, and defamation.


### A.    Hostile Work Environment

Plaintiff does not bring a stand-alone claim for sex-based discrimination under Title VII.  [Doc. 54 at 8.]  Rather, she pleads that the Savannah incident with defendant Kreps (which she dubs an incident of sexual harassment) is a part of her sex-based hostile working environment claim against AgXplore.  [Doc. 33 at ¶ 43.]

To state a claim, a prevailing plaintiff must show that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment based on sex; (3) the harassment affected a term, condition, or privilege of her employment; (4) her employer knew or should have known of the harassment; and (5) the employer failed to take proper action."  *Rickard*, 773 F.3d at 184–85 (quoting cases).  Plaintiff need not prove the final two prongs if her *supervisor* created the hostile environment.

10

For a hostile work environment claim, for the alleged harassment to be actionable it "must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). To determine whether the harassment affected a term, condition, or privilege of employment, the Court considers "the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically humiliating or threatening, and whether it unreasonably interferes with [plaintiff's] job performance." *Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015) (quoting *Ran v. Cap. Contractors, Inc.¸* 679 F.3d 772, 778–79 (8th Cir. 2012); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) (explaining factors and circumstances of harassment).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "The standards for a hostile environment are demanding, and 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)).

In this case, there is a threshold issue—exhaustion of administrative remedies—which is dispositive. Before filing a lawsuit alleging discrimination in violation of Title VII, plaintiff must exhaust administrative remedies by filing a charge with the Equal

11

Employment Opportunity Commission or a comparable state agency within 180 days of the date of the alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1); *Shannon v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir. 1996).  Defendant argues that plaintiff's claim is time-barred because plaintiff did not face any sexual harassment after November 7, 2018 and plaintiff did not file a complaint with the EEOC until April 20, 2020, well-outside the 180-day window.  [Doc. 48 at 9–10.]  Plaintiff responds that her complaint is not time-barred because she faced continuing harassment, starting with the Savannah incident, and continuing through her termination.   [Doc. 54 at 8] (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002)).  Defendant replies that the continuing violation theory does not apply to plaintiff's claims because her claim for sexual harassment only arises from a single incident.  [Doc. 58 at 9–10]

Because a hostile work environment may consist of a series of separate acts, plaintiff only needed to file her charge within 180 days of at least one act that is part of the hostile work environment.  *See Slayden v. Ctr. For Behav. Med.*, 53 F.4th 464, 467 (8th Cir. 2022).  As to instances of continued harassment, plaintiff points to the fact that she was "forced to work [with defendant Kreps] for more than a year after" and that  "she was isolated, disparaged, [and] paid less than her counterparts. . . ."  *Id.* at 9–10.  But plaintiff fails to show how this other conduct was actionable harassment related to her sex.  In effect, she fails to tie the complained-of harassment to the elements of a hostile work environment claim.  In a two-paragraph response, she offers no analysis on this point, but merely states conclusory allegations that the complained-of conduct qualifies as harassment, without any authority to support her claim.  [Doc. 55 at 9–10.]

For instance, plaintiff complains that defendants tried to isolate her at work by telling other salespeople not to communicate with plaintiff. Even if true, it is hard to see how this isolated plaintiff or detrimentally affected her job because she worked remotely. Plaintiff did not even find out that defendants told her coworkers not to contact her until after she had left her job. Also, plaintiff's complaint that she was forced to work with defendant Kreps after the Savannah incident is unsupported: the record shows that defendant Kreps was removed as plaintiff's supervisor shortly after she made her complaints. Moreover, plaintiff cannot complain that her transfer from marketing to sales was motivated by revenge for her making her sexual harassment complaint because the decision to transfer her occurred *before* she complained of the harassment. Even if defendant Kreps and others disparaged plaintiff and gossiped about her sex life outside of her presence, this activity was not so severe and frequent enough to create a hostile work environment. From all accounts, plaintiff did not even find out about these comments until after she left AgXplore. *See* [Doc. 53-6 at 314–315.] Lastly, plaintiff offers no evidence to suggest that her final compensation agreement was the result of harassment, but only says that she "felt" like it was retaliation for making her complaint. [Doc. 53-6 at 288.]

In this case, there was never even physical contact between any of defendants and plaintiff. No person ever made any other lewd or sexual remarks to her. As plaintiff concedes, there was one incident, and one incident only, that could be considered sexually harassing behavior—the alleged sexual proposition by defendant Kreps in Savannah on November 7, 2018. [Doc. 55 at ¶ 18]. In the absence of evidence of a continuing violation, plaintiff's claim does not extend beyond November 7, 2018, which is outside the 180-day

window for filing a claim. *See Slayden v. Ctr. For Behav. Med.*, 53 F.4th 464, 467–68 (8th Cir. 2022) (holding that plaintiff's hostile work environment claim was time barred when plaintiff admitted that there was only one instance of harassing behavior).

Even if plaintiff's claim were not time-barred, none of the complained-of behavior—even the Savannah incident—meets the standard for actionable harassment. *See, e.g.*, *LeGrand v. Area Res. for Cmty. & Hum. Servs.*, 394 F.3d 1098, 1102–1103 (8th Cir. 2005) (finding no actionable harassment when the harasser asked the plaintiff to view pornography with him, masturbate together, grabbed plaintiff's bottom, and reached for other parts of plaintiff's body); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535 (8th Cir. 2020) (finding no actionable harassment against a male supervisor who frequently lost his temper with employees; referred to female customers with derogatory names; demeaned women with sexually suggestive treatment; bragged about sexual conquests; tried to touch female coworker; and bragged about his ability to "have" plaintiff); *McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (no actionable harassment when a male supervisor "kissed [plaintiff's] face on two occasions, placed his arms around her or attempted to do so three times, and requested that she remove an ingrown hair from an area near his chin").

In contrast to those cases, here, defendant Kreps never physically touched plaintiff. He did not expose himself or otherwise make a physical advance on plaintiff. He was fully clothed. He did not threaten plaintiff, berate her for refusing his advances, or attempt to follow her out of the hotel room or prevent her from doing so. No one else was around to view this incident or cause plaintiff any further social embarrassment. In short, plaintiff's

14

allegations do not approach the requisite level of severity to give rise to actionable harassment. *Cf. Barrett v. Omaha Nat. Bank*, 584 F. Supp. 22 (D. Neb. 1983), *aff'd*, 726 F.2d 424 (8th Cir. 1984) (finding actionable harassment when a male coworker, at an employer-sponsored trip to a business seminar, rubbed the plaintiff's thighs, pressed his arm into her breast, grabbed her crotch area, and repeatedly made lewd and sexual comments). Therefore, plaintiff's claim for hostile work environment fails even on its merits.

### B.    Retaliation

Unlike with her hostile work environment claim, defendant does not argue that plaintiff's retaliation claim is time-barred. Instead, AgXplore argues that plaintiff fails to make out a prima facie case under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001).

 If plaintiff establishes a prima facie case, AgXplore must rebut it by showing a non-discriminatory reason for its decision to terminate plaintiff. *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005). In response, plaintiff must prove that AgXplore's action was pretextual by showing that, among other ways, it "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its

15

explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  There are at least two ways for plaintiff to demonstrate a material question of fact as to pretext: "First, a plaintiff may succeed 'indirectly' by showing the proffered explanation has no basis in fact.  Second, a plaintiff can 'directly' persuade the court that a prohibited reason more likely motivated the employer." *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 521 (8th Cir. 2010) (internal case citations and quotations omitted).

Here, plaintiff has failed to establish a prima facie case.  Plaintiff agrees that her refusal to sign the Handbook, which included the new the anti-sexual harassment policy, was not "protected activity." [Doc. 55 at 11.]  Instead, she claims that her protected activity was "the complaints that Plaintiff lodged in explaining her refusal [to sign the Handbook]. . . ." [Doc. 54 at 11.]  To be sure, lodging complaints of sexual harassment is protected conduct.  She argues that because she raised her complaints again, AgXplore decided to retaliate against her by firing her when she did not sign the Handbook, as if it would not otherwise have done so. *Id.*

In fact, AgXplore required that all employees sign the Handbook *before* plaintiff reiterated her sexual harassment complaints. Although plaintiff points out that defendant Gutwein was angry at her for plaintiff raising complaints again, and seemed to have a grudge against her, that is no indication that she was singled out for her refusal to sign the Handbook.  The parties do not dispute that plaintiff was only fired after she refused to sign the Handbook, that she had several opportunities to sign the Handbook, and that she was given several warnings that she would be fired if she did not sign.  Finally, AgXplore made clear that it would interpret plaintiff's non-signing as a voluntary resignation.  Under these

16

circumstances, the causal connection between plaintiff's protected conduct and the adverse employment action is simply too tenuous to constitute a prima face case of retaliation.

Even if plaintiff had managed to establish a prima facie case, AgXplore offers a non-discriminatory reason for the adverse employment action: it wanted employees to sign the Handbook and comply with it.  Plaintiff argues this was merely pretextual because, sometime earlier, there was a group of similarly situated employees who were not fired when they refused to sign an entirely different conflict-of-interest policy issued by the company.  With that policy, defendant Gutwein decided it was best just to "let it go" and let the employees keep their jobs.  [Doc. 53-10 at 40–41.]  Plaintiff argues that defendant Gutwein could have and should have "let it go" with her refusal to sign the Handbook.  But plaintiff overlooks the fact that she was *part of that very same group* that refused to sign the conflict-of-interest page, and she was not fired for her refusal to sign.

Plaintiff also claims that "suspicious timing" establishes pretext—that shortly after she raised her complaints a second time, defendant Gutwein remarked that he was okay with eliminating her position at AgXplore.  But plaintiff's claims of "suspicious timing" are not, by themselves, enough to establish an issue of fact as to pretext.  *Yearns v. Koss Constr. Company*, 964 F.3d 671, 675 (8th Cir. 2020) (quoting *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1109 (8th Cir. 2020)) ("For instance, timing alone is not enough to establish pretext, even if it can create an inference of retaliation at step one.") (internal quotation marks omitted); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  Also, this claim is defeated by the fact that the company issued the Handbook and asked employees to sign it *before* plaintiff made her complaints again.  Plaintiff was able to

17

anticipate the consequences of refusing to sign the Handbook and that her failure to do so could result in termination. *Couch*, 955 F.3d at 1109 (citing *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 742 (8th Cir. 2017)) ("[C]lose timing is less meaningful when a plaintiff could have anticipated an adverse employment action.")

Accordingly, summary judgment will be granted on plaintiff's retaliation claim.


C.   <u>Defamation</u>

As this Court ruled earlier, plaintiff may only bring claims of defamation for statements made after her employment, [Doc. 13], so any statements made about plaintiff during her employment are not considered.  Plaintiff claims there are five instances when defendants made defamatory statements about her after she left AgXplore.  She alleges that defendant Gutwein's April 2021 memo is defamatory, and that Gutwein made defamatory statements to Brandon McMillan.  She also alleges that defendant Kreps made defamatory statements to Brandon McMillan, Brian Ciganiero, coworker Jennifer Posey-Williams, and five of plaintiff's other coworkers.

As an initial matter, the statements attributed to coworkers who have given neither an affidavit nor a deposition are inadmissible hearsay.  Only Mr. McMillan submitted an affidavit in which the statements are set out, and those statements, along with defendant Gutwein's memo, are all that are admissible.

 "The elements of defamation in Missouri are: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Overcast v. Billings*

18

*Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. *banc* 2000).  First, a court must determine whether a statement is capable of defamatory meaning in that it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Turntine v. Peterson*, 959 F.3d 873, 882 (8th Cir. 2020) (quoting *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. *banc* 1985)).  The words must be evaluated according to their plain and ordinary meaning and in the context in which they were given.  *Id.*  If a statement is capable of a nondefamatory meaning and can be reasonably construed in an innocent sense, then the statement is nonactionable as a matter of law.  *Castle Rock Remodeling, LLC, v. Better Bus. Bureau of Greater St.* Louis, 354 S.W.3d 234, 239 (Mo. App. E.D. 2011) (citing *Mandel v. O'Connor*, 99 S.W.3d 33, 36 (Mo. App. E.D.2003)).  If the words are defamatory, the second step is to determine whether a privilege shields the defendant from liability.  *Turntine*, 959 F.3d at 882.

Statements of opinion, even if made maliciously or insincerely, are protected speech under the First Amendment and cannot be actionable defamation.  *Hammer v. City of Osage Beach, Mo.*, 318 F.3d 832, 842 (8th Cir. 2003).  Whether a statement is protected opinion is a question of law.  *Id.*  The Court must consider the totality of the circumstances to determine whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact.  *Id.*  (citing Missouri cases).  But even some expressions labeled as "opinion" may be defamatory if they imply an assertion of objective fact.  *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 799 (Mo. 2017).

The Eighth Circuit outlined the scope of protected opinion in *Hammer*.  In that case, the mayor of Osage Beach issued a press statement referring to plaintiff, the city

19

administrator, and accusing him of improper and illegal activity.  318 F.3d at 836.  Plaintiff then sued the city for defamation based on the press release.  *Id.*  The Eighth Circuit held that the mayor's statements were protected opinion.  *Id.* at 844.  The court looked at the surrounding circumstances, including "numerous comments [that] had been circulating regarding the present state of the City's government and the conduct of City officials."  *Id.* at 843.  Because the mayor made the press release in response to these concerns and to defend his own actions, he was providing protected opinion.  *Id.*

There are also times when statements about a specific incident, though couched as opinions, may be defamatory because they refer to a verifiable, historical incident. *Turntine*,  959 F.3d at 886–87.  In *Turntine*, the defendant published statements about its business relationship with plaintiff, such as "by discussing how [plaintiff's] explanation for the parties' soured business relationship was not true and that the true explanation was that [plaintiff] had engaged in underhanded business dealings with [defendant]."  *Id.* at 885.  Given the surrounding context, the court concluded that defendant was making false allegations about his specific relationship with plaintiff.  *Id.* at 886–87.  Furthermore, when asked to clarify whether his statements were "nonfactual bluster," defendant "doubled down, explaining that he meant to claim [plaintiff] actually lied."  *Id.* at 887.  Thus, the court concluded that defendant's statements could imply assertions of objective fact.

Relying on *Turntine*, plaintiff argues that the proffered statements are not opinion because they imply that plaintiff lied about the Savannah incident, which would be a statement of objective, historical fact.  [Doc. 54 at 17.]  However, Gutwein's April 2021 memo makes no direct reference to the Savannah incident.  It only asserts that AgXplore

20

"will vigorously dispute false allegations and will have its day in court where these allegations will be exposed for what they are." [Doc. 49-11.]  Like in *Hammer*, given the circumstances, defendants were justified in responding to plaintiff's allegations.  The memo makes clear that it was "intended to provide information and guidance in regard to the allegations filed against AgXplore International" and promised to "dispute false allegations" in the course of a lawsuit.  [Doc. 49-11.]  The statements in the memo are far less scandalous than the press release in *Hammer*, which directly accused the plaintiff of illegal activity.  Given the circumstances, it can hardly be the case that plaintiff is defamed simply because the defendants dispute the validity of plaintiff's legal claims.  Because the memo is directed only to plaintiff's lawsuit in general, it only expresses mere statements of opinion that cannot form the basis of defamation claim.

Plaintiff's contention that former employee Brandon McMillian said that defendant Gutwein told him and others that plaintiff "was lying about her claims and that she has no evidence to support them" misrepresents his affidavit.  [Doc. 54 at 15.]  Mr. McMillan's actual statement is that "Mr. Gutwein would make comments to me and others about how Misti had no evidence to back up her claims, so this wouldn't go anywhere and not to worry."  [Doc. 53-18 at ¶ 4.]  Like with the memo above, this is a statement of opinion. Defendant Gutwein merely shared his own subjective assessment, which is not an objectively verifiable fact.  *See Castle Rock Remodeling, LLC.*, 354 S.W.3d at 242.

In the same affidavit, Mr. McMillan says that after plaintiff's termination,

Gunter Kreps said to me and others on multiple occasions that there was nothing to Misti's legal claims.  He would say he did nothing wrong, and that Misti was just angry she did not get his position. He told us that her claim

21

was a "money grab."  He would brag that she had nothing on him, and that Ms. McBride was resorting to this to get revenge.

[Doc. 53-18 at ¶ 8.]  In contrast to defendant Gutwein's statements, defendant Kreps goes further than merely denying plaintiff's claims.  He says that plaintiff's claim was a "money grab" and that she was trying to "get revenge," which is more than mere "nonfactual bluster" and is more like the assertion of an objective fact rather than a subjective assessment.  *See Turntine*, 959 F.3d at 887.  Although it is a close case, defendant Kreps's statements may constitute defamation.

Defendants contend that even if any of these statements were defamatory, plaintiff provides no evidence that anyone believed the statements or that they harmed plaintiff's reputation.  "Proof of actual harm to the plaintiff's reputation is an absolute prerequisite in a defamation action."  *King v. Union Station Holdings, LLC*, No. 4:12-CV-696-SNLJ, 2012 WL 5351598, at *2 (E.D. Mo. Oct. 30, 2012) (citing *Cockram v. Genesco, Inc.*, 680 F.3d. 1046, 1053–54 (8th Cir. 2012)).   Plaintiff's conclusory statements that she felt "embarrassed, shocked, [or] mad" do not suffice.  *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 817 (Mo. *banc* 2003).  Instead, plaintiff must show that defendants' statements caused people to respect her less or think of her reputation as being lowered.  *Id.*

Here, the only relevant evidence plaintiff offers to establish harm to her reputation is Mr. McMillan's sworn observation that defendant Kreps's statements  "damaged her because they painted her as a liar."  [Doc. 53-18 at ¶ 9.]  Though it is again a close case, this evidence is sufficient to raise a factual issue as to actual harm and avoid summary judgment, though only as to defendant Kreps and his employer, AgXplore.

22

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. 47] is **GRANTED IN PART** and **DENIED IN PART**.  Summary judgment is granted on all claims except for Count III as to defendants Kreps and AgXplore.

**IT IS FURTHER ORDERED** that plaintiff's motion to reschedule the trial date [Doc. 63] is **GRANTED**, and trial will be reset for Monday, May 15 through Friday, May 19 2023.


Dated this 10th day of February, 2023.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE